Argued and submitted September 7, 1988, the decision of the Court of Appeals and judgment of the circuit court affirmed November 30, 1989, reconsideration denied January 11, 1990

# HALE,
*Petitioner on Review,*

*v.*

# PORT OF PORTLAND et al,
*Respondents on Review.*

## (TC A8104-02187; CA A35081; SC S35062)

783 P2d 506

Frank M. Parisi, Portland, argued the cause on behalf of petitioner on review. With him on the petition were Robin B. Parisi, Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, and Barrie J. Herbold, Markowitz & Herbold, P.C., Portland.

William P. Buren, Portland, argued the cause on behalf of respondent on review Port of Portland. With him on the response was Lindsay, Hart, Neil & Weigler, Portland.

Ridgway K. Foley, Jr., Portland, argued the cause on behalf of respondent on review City of Portland. With him on the response was Schwabe, Williamson & Wyatt, Portland.

Arthur C. Johnson, Eugene, filed a brief on behalf of *amicus curiae* Johnson, Clifton, Larson & Bolin, P.C. With him on the brief were Michael V. Phillips and Douglas G. Schaller, Eugene.

David Gernant, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

James N. Westwood, Portland, filed a brief on behalf of

*amicus curiae* Oregon Association of Defense Counsel. With him on the brief were William H. Walters and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Jerome Lidz, Assistant Attorney General, Salem, filed a brief on behalf of *amicus curiae* State of Oregon. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Michael E. Judd, Chief Assistant County Counsel, Clackamas County Counsel, Oregon City, filed a brief on behalf of *amici curiae* Association of Oregon Counties and Oregon School Boards Association. With him on the brief were Edward C. Harms, Jr., Springfield, and Paul Snider, Legal Counsel, Association of Oregon Counties, Salem.

Timothy Sercombe, Eugene, filed a brief on behalf of *amicus curiae* League of Oregon Cities. With him on the brief was Harrang, Long, Watkinson & Arnold, P.C., Eugene.

Before Peterson, Chief Justice, and Linde, Campbell,** Carson, Jones, and Gillette, Justices.

GILLETTE, J.

---

** Campbell, J., retired December 31, 1988.

## GILLETTE, J.

The issue in this case is whether the damage limitations in the Oregon Tort Claims Act (OTCA)[1] are constitutional as applied to cities and port districts. The Court of Appeals upheld the limitations. *Hale v. Port of Portland,* 89 Or App 209, 748 P2d 161 (1988). We affirm.

Plaintiff suffered severe injuries in a November 3, 1980, accident occurring when the vehicle in which he was riding collided with an obstacle embedded in a road. Plaintiff's medical bills alone reportedly exceed $600,000. Through his guardian *ad litem,* he filed this action against several defendants, including two municipal corporations, the City of Portland (the City) and the Port of Portland (the Port). He charged that the City and the Port were responsible for maintaining the road and were negligent in several respects with respect to the obstacle. The circuit court granted motions by the Port and the City to strike plaintiff's claim for damages in excess of the $100,000 damage limitation in ORS 20.270(1)(b). The City and the Port then each confessed judgment for $100,000. Plaintiff appealed, and the Court of Appeals affirmed. We allowed review to address the important issues involved.

The City and the Port are each "public bodies" subject to ORS 30.265(1), which provides:

> "Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function * * *."

ORS 30.270(1) limits the potential liability of public bodies as follows:

> "Liability of any public body or its officers, employees or agents acting within the scope of their employment or duties on claims within the scope of ORS 30.260 to 30.300 shall not exceed:
>
> "(a)   $50,000 to any claimant for any number of claims

---

[1] ORS 30.260-30.300.

for damage to or destruction of property, including consequential damages, arising out of a single accident or occurrence.

"(b) $100,000 to any claimant for all other claims arising out of single accident or occurrence.

"(c) $300,000 for any number of claims arising out of a single accident or occurrence."

The trial court applied ORS 30.270(1)(b) in limiting the liability of the City and the Port. Plaintiff challenges the constitutionality of that statute.

Absent a constitutional provision to the contrary, the legislature has plenary lawmaking authority, including the authority to immunize partially public bodies like the City and the Port. *See, e.g., Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 100, 570 P2d 52 (1977); *Deras v. Myers,* 272 Or 47, 52 n 3, 535 P2d 541 (1975); *see also* Linde, *Without "Due Process": Unconstitutional Law in Oregon,* 49 Or L Rev 125, 147 (1970). Plaintiff argues, however, that the OTCA damage limitations are contrary to three provisions of the Oregon Constitution. Plaintiff first claims that Article IV, section 24, of the Oregon Constitution requires complete waiver of immunity to suit for the state or any other public body, to the extent that public body partakes of the state's sovereign immunity. Plaintiff further argues that, in any event, the damage limitations violate Article 1, sections 10 and 20, of the Oregon Constitution. Plaintiff also claims that the damage limitations violate his rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution. We begin by examining the argument under Article I, section 24, because, if plaintiff's interpretation of that section were correct, *i.e.,* if the section required the legislature to waive the immunity in its entirety for the state and any other public bodies, we would not need to proceed further.[2]

## I. ARTICLE IV, SECTION 24

Article IV, section 24, of the Oregon Constitution provides:

---

[2] We phrase the issue so broadly in order to encompass both the state's immunity from suit as the sovereign as well as any immunity municipal corporations may have as agencies of the state. *See* Section II, *post* (discussing, in part, rules of immunity applying to municipal corporations).

"Provision may be made by general law, for bringing suit against the State, as to all liabilities originating after, or existing at the time of the adoption of this Constitution; but no special act authorizeing [sic] such suit to be brought, or making compensation to any person claiming damages against the State, shall ever be passed."

Plaintiff treats this constitutional text as applicable to both his claim against the Port and against the City. As we shall demonstrate later, the actual basis for the City's immunity (if any) derives only in part from that of the sovereign. However, this distinction is not important to this portion of the discussion.

Textually, Article IV, section 24, is permissive, not mandatory. Use of the word "may" indicates only that the legislature has the *authority* to waive immunity, not an obligation to do so. In his petition for review, plaintiff nonetheless argues that, rather than granting constitutional status to sovereign immunity, Article IV, section 24, requires its waiver. Because of the imprecision as to this point in some of this court's prior cases, we will begin by explaining the basis for sovereign immunity in Oregon. We will then determine the effect of Article IV, section 24.

Sovereign immunity originated in the rule that the English King could not be sued in his own courts. *See* 1 Pollock & Maitland, History of English Law 518 (2d ed 1898); *see also Nevada v. Hall,* 440 US 410, 414, 99 S Ct 1182, 59 L Ed 2d 416 (1979) ("The immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries"); *see generally* Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 Harv L Rev 1 (1963) (discussing the evolution of sovereign immunity in England and the United States). Although arguably not justified in a democracy,[3] the sovereign immunity of the American states was universally accepted. *See Noonan v. City of Portland,* 161 Or 213, 220, 88 P2d 808 (1939); *see also Nevada v. Hall, supra,* 440 US at 415-16.

The Oregon Territory adopted the English common law in two acts. The first, enacted in 1843, provided:

---

[3] *See, e.g., Hoffman, Trustee v. Connecticut Dept. of Income Maintenance,* ____ US ____, 109 S Ct 2818, 106 L Ed 2d 76 (1989). *See also* Massey, State Sovereignty and the Tenth and Eleventh Amendments, 56 U Chi L Rev 61 (1989).

> "The laws of the Iowa territory shall be the law of this territory, in civil, military, and criminal cases; where not otherwise provided for, and where no statute of Iowa territory applies, the principles of common law and equity shall govern."

Act of July 5, 1843, reprinted in Harris, *History of the Oregon Code,* 1 Or L Rev 129, 135 (1922). The second, enacted in 1844, provided:

> "[T]he common law of England and principles of equity, not modified by the statutes of Iowa or of this government, and not incompatible with its principles, shall constitute a part of the law of this land."

Act of June 27, 1844, Or L 1843-49 at 98, 100, Art III, § 1. Neither Iowa nor Oregon had modified common-law sovereign immunity in 1844. *Cf. Metz v. Soule, Kretsinger & Co.,* 40 Iowa 236, 239-40 (1875) (using doctrines of sovereign immunity as applied in England, without modification). Between 1844 and 1859, the Oregon Territory apparently did not modify the common law rule. Thus, sovereign immunity was a part of this state's law at the time of statehood.[4]

Statehood did not change the law. Article XVIII, section 7, of the Oregon Constitution, adopted in 1859, provides:

> "All laws in force in the Territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed."

The effect of this provision was to incorporate the territory's pre-existing law which, as we have shown, incorporated the English common law. Consistent with the foregoing, this court since statehood has asserted that the state may not be sued without its consent.[5] In light of the constitutional provi-

---

[4] For other cases analyzing the adoption of the English common-law in Oregon, see *Koos v. Roth,* 293 Or 670, 683, 652 P2d 1255 (1982); *Lytle v. Hulen,* 128 Or 483, 510, 275 P 45 (1929).

[5] *See, e.g., Espinosa v. Southern Pacific Trans.,* 291 Or 853, 857, 635 P2d 638 (1981) (state's immunity from suit extends to school districts); *State v. Shinkle,* 231 Or 528, 529-30, 373 P2d 674 (1962) ("We begin with the established doctrine that the State of Oregon is not subject to suit except as the legislature has otherwise provided"); *Vendrell v. School District No. 26C et al,* 226 Or 263, 278, 360 P2d 282 (1961) ("it is apparent that the doctrine of sovereign immunity exists in this state"); *James & Yost v. Board of Higher Edu.,* 216 Or 598, 601, 340 P2d 577 (1959) ("under the Oregon Constitution only the people by legislative act may waive the state's immunity from suit"); *Rogers v. Holmes et al,* 214 Or 687, 692, 332 P2d 608 (1958) ("That a sovereign

sion, this court's previous cases, and of the universal adoption of sovereign immunity elsewhere, we conclude that, absent some specific constitutional provision to the contrary, sovereign immunity became part of Oregon's law with statehood.

With this historical background in mind, we must determine the role of Article IV, section 24. The parties advance opposing theories as to the effect of that section. Defendants argue that it established sovereign immunity as a constitutional doctrine. Plaintiff claims that the provision was actually meant to require the legislature to waive the state's sovereign immunity. Neither view is correct.

Although Article IV, section 24, assumes the pre-existence of sovereign immunity, nothing in its language establishes that immunity. Indeed, in light of the effect of Article XVIII, section 7, incorporating immunity from prior Oregon law, an explicit incorporation of immunity was unnecessary. Plaintiff, however, would have us determine that Article IV, section 24, intended a *waiver* of sovereign immunity, contemplating that the legislature would allow actions against the state generally but could not pass any special act to compensate any one individual.

In addressing plaintiff's theory, we begin with the constitutional text. On its face, Article IV, section 24, makes waiver of the state's immunity permissive: it states that "[p]rovision *may* be made" for actions against the state. (Emphasis added.) It does not mandate that provision *must* be made for such actions and, absent later legislative permission, such actions would not have been cognizable in Oregon courts.

Moreover, nothing in the history of the constitutional conventions of Oregon or of Indiana — the state from whose constitution Article IV, section 24 was taken — justifies a contrary reading. There is no evidence that the delegates to the Oregon convention ever publicly debated the section that

state cannot be sued without its consent is a cardinal principle of law so well established as to require no citation"); *United Contracting Co. v. Duby,* 134 Or 1, 7-8, 292 P 309 (1930) ("the rule, well established in this jurisdiction [is] that the state cannot be sued in its own courts without its consent"); *Keene v. Smith,* 44 Or 525, 526, 75 P 1065 (1904) ("such is the condition of the law that no suit or action can be instituted or maintained against [the state] except with its consent"); *Salem Mills Co. v. Lord,* 42 Or 82, 88, 69 P 1033 (1902) ("The point is conceded that a state is not suable without its consent").

became Article IV, section 24; plaintiff's arguments based on the debates in Carey, the Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857 (1926), concern a different section that was not adopted and therefore are not helpful.

Plaintiff's reliance on the record of the Indiana constitutional convention is equally misplaced. Those debates are, at best, inconclusive on the question, and that state's highest court would later hold "that the framers of the [Indiana] Constitution assumed that at common law the State was immune from suit and authorized the legislature to modify such liability to the extent it may see fit." *Perkins v. State,* 252 Ind 549, 551, 251 NE2d 30, 32 (1969).[6]

It remains to be determined what purpose Article IV, section 24, was intended to serve. The Oregon Constitution allocates power. *See Brown v. Multnomah County Dist. Ct., supra; Deras v. Myers, supra;* Linde, *supra,* 49 Or L Rev at 147. Article IV, section 24, allocates the power to waive that sovereign immunity to the legislature, not to the courts. *See Vendrell v. School District No. 26C et al,* 226 Or 263, 278, 360 P2d 282 (1961) ("[o]ur Constitution is framed on the premise that the state is immune from suit and that if immunity is lifted it shall be done so by the legislature"); *see also Cole v.*

---

[6] We note the idea advanced by the Indiana Supreme Court in *Perkins* and, later, in *Campbell v. State,* 259 Ind 55, 284 NE2d 733 (1972), that the court could itself change or abolish sovereign immunity. Our position is not analogous. Under our Constitution, Article IV, section 24, allocates the power to abolish sovereign immunity only to the legislature. In any event, abolition by this court of common-law sovereign immunity would have no effect on the outcome of this case because the OTCA establishes partial immunity by statute. *See Heino v. Harper,* 306 Or 347, 759 P2d 253 (1988).

Another of plaintiff's arguments is easily dismissed. He cites Article XV, section 7, of the Oregon Constitution to show that the constitutional convention expected claims to be filed against the state. That section provides:

"No State officers, or members of the Legislative Assembly, shall directly or indirectly receive a fee, or be engaged as counsel, agent, or Attorney in the prosecution of any claim against the State."

Certainly, the delegates to the constitutional convention anticipated that claims against the state would be permitted. There is, however, no reason to think that such anticipation correlated with an intent to waive sovereign immunity. It more probably reflected a recognition of the political reality that, once the constitution took effect, the legislature might enact general laws allowing some claims against the state. Article XV, section 7, was designed to ensure that when and if claims against the state were permitted, no state official would be allowed to profit from or use his position to influence those claims.

*Dept. of Rev.,* 294 Or 188, 191, 655 P2d 171 (1982) ("immunity of the state [is] implicit in article IV, section 24").

The section also specifies the form in which the immunity may be waived, if at all. Prior to statehood, suits against the territorial government were sometimes allowed by special legislative act. *See, e.g.,* Act for the Relief of the Heirs of Ewing Young, Deceased, of January 31, 1855, Special Laws Passed by the Legislative Assembly of the Territory of Oregon 25 (1855). Article IV, section 24, modifies this procedure to require that any waiver of immunity apply generally and that the legislature no longer may allow for recovery by special act. The section is both permissive and directory: It permits waiver of sovereign immunity; it directs the form such a waiver, if made, must take.

To summarize, Article IV, section 24, does not bar the state from holding itself immune from suit. It also does not bar the state from partially waiving its immunity by general law, which it has done in the OTCA. In addition, the section says nothing to prohibit or restrict the legislature's power to extend partial immunity to legislatively created or authorized municipal corporations like the City and the Port. Thus, Article IV, section 24, did not prohibit the enactment of ORS 30.270(1)(b). Whether some other constitutional provision prohibits the legislature from extending the state's immunity to cities and port districts is an issue to which we now turn.

## II. ARTICLE I, SECTION 10

Plaintiff argues that the OTCA public body damage limitations deny him his "remedy by due course of law for injury done him in his person" in violation of Article I, section 10, of the Oregon Constitution. Defendants respond that Article I, section 10, is subordinate to the state's sovereign immunity. The analysis is somewhat more complex than that.

### 1. The Port and Immunity

The Port of Portland was established by 1891 Or Laws 791 as "a separate district, to be known as The Port of Portland" (Section 1), which was, among other things, to "have full control of [the Willamette and Columbia Rivers] at [Portland, East Portland and Albina], and between said cities and the sea, so far and to the full extent that this State can grant the same" (Section 3). While its functions have been

expanded to reflect the changed commercial focus of the Pacific Northwest due to the passage of nearly a century, the Port continues to promote, *inter alia,* the maritime and shipping interests of the greater Portland area. ORS 778.015; *see generally* ORS ch 778 (establishing the Port of Portland and describing its organization, functions, and duties); *see also Cook v. The Port of Portland,* 20 Or 580, 27 P 263 (1891) (declaring the Port's organic act constitutional). Unlike cities, but like other port districts, *see generally,* ORS ch 777, the Port is an instrumentality of the state government, performing state functions.

■■ Other state instrumentalities, including some in the form of municipal corporations, partake fully of the state's immunity from suit. *See, e.g., Vendrell v. School District No. 26C et al, supra* (recognizing application of sovereign immunity to school districts); *Templeton v. Linn County,* 22 Or 313, 29 P 795 (1892) (counties likewise immune unless action authorized by legislature); *Gearin v. Marion County,* 110 Or 390, 223 P 929 (1924) (same). The Port, being a part of the state's government, therefore is immune from suit to the same extent the state as such is immune. It follows that, contrary to the contention of plaintiff here, ORS 30.270(1)(b) does not deny plaintiff any right he has against the Port by virtue of the guarantee in Oregon Constitution Article I, section 10, because there never was such a right.

### 2. The City and Immunity

■ We turn to a consideration of the plaintiff's rights (if any) against the City. In Oregon, cities have never enjoyed full immunity equivalent to the state's sovereign immunity. At common law, the state's immunity from suit extended to municipal corporations only when they were engaged in so-called "governmental" functions. *Noonan v. City of Portland, supra,* 161 Or at 221. Immunity did not extend to torts municipal corporations committed while performing "proprietary" acts, or to municipal employees. *Id.; see also Blue v. City of Union,* 159 Or 5, 11-12, 75 P2d 977 (1938) ("it is established law that when a [municipal] corporation exercises a purely corporate and proprietary or private function * * * it is subject to suit without statutory authority, the same as any individual similarly engaged").[7] The maintenance of roads and streets

---

[7] As will be shown by the following discussion, ORS 30.265 eschews this distinction.

was somewhat arbitrarily classified as this second, "proprietary" type of activity. *Noonan v. City of Portland, supra,* 161 Or at 237. By contrast, negligent operation of a city park was treated as "governmental," with concomitant immunity from suit. *See Etter v. City of Eugene,* 157 Or 68, 71, 69 P2d 1061 (1937). The exception of streets from the "governmental" umbrella was illogical, as this court recognized in *Noonan v. City of Portland, supra,* 161 Or at 247, but the "proprietary" label stuck.[8]

The "governmental"/"proprietary" dichotomy has received sustained and withering criticism. *See Northwest Natural Gas Co. v. City of Portland,* 300 Or 291, 297-301, 711 P2d 119 (1985) (citing various texts). We mention the dichotomy here not as an endorsement, but as an historical description.

From early on, the legislature let cities avoid that liability, even for proprietary functions, through legislatively-enacted charter provisions absolving the cities of liability. *See, e.g., Mattson v. Astoria,* 39 Or 577, 65 P 1066 (1901). Through a convoluted series of decisions by this court, the rule evolved that these charter provisions did not violate Article 1, section 10, so long as they did not wholly eliminate the injured party's remedies. For example, charter provisions absolving both the municipality and its officers from liability were invalidated, while those that did not eliminate the injured party's right to

---

[8] Or, it stuck after some backing and filling. In at least two opinions, this court declared that maintaining the streets was a "governmental" function. *See Platt v. Newberg,* 104 Or 148, 158-59, 205 P 296 (1922); *Humphrey v. Portland,* 79 Or 430, 446, 154 P 897 (1916). While later acknowledging these cases, this court dismissed their apparent holdings on the ground that those holdings were "only one of the [alternative] bases of [each] decision." *Noonan v. City of Portland, supra,* n 10, 161 Or at 242. Nonetheless, it was true then (and would remain true to this day, if the matter were of any moment) that "Article I, § 10, Oregon Constitution, was not intended to give anyone a vested right in the law either statutory or common; nor was it intended to render the law static." *Id.* at 249. This court could, even at this date, conclude that earlier decisions treating maintenance of streets as "proprietary" should no longer be followed because, *inter alia,* factual assumptions concerning the nature of that enterprise are no longer accurate. *See, e.g., Heino v. Harper, supra* n 6 (discussing methodology in reconsidering common-law decisions). And this capacity to review the labels to be attached to particular functions could cut either way, *i.e.,* this court could as readily conclude that virtually all city activities today are "governmental" as it could conclude that the same activities are "proprietary."

recover from the municipal corporation's officers were upheld.[9]

Our struggle with the issue of sovereign immunity and cities came to an end (it might be too much to call it a conclusion) in *Noonan v. City of Portland, supra.* In that case, the plaintiff had been injured when the high heel of her shoe became stuck in an allegedly defective angle iron that formed the outer edge of the curb of a Portland street. The trial court granted an involuntary nonsuit at the end of the plaintiff's case. Plaintiff appealed.

The City of Portland relied principally on a section of its charter providing that a person injured by a defective street or sidewalk could sue those persons "on whom the law may have imposed the obligation to repair such defect * * * and also the officer or officers through whose official negligence such defect remains unrepaired," but could not sue the city itself. *Id.* at 216 (citing Section 281 of the Portland City Charter). Plaintiff claimed that the charter section was contrary to Article I, section 10.

This court, after an exhaustive examination of the authorities which we need not repeat here, affirmed the trial court. We synthesized our previous jurisprudence as follows:

> "We believe that all of our previous decisions were correctly decided and that their reasons were sound, with the exception of those that deemed the maintenance of streets a governmental function. * * *
>
> "* * * * *
>
> "But the plaintiff contends that Art. I, § 10, Oregon Constitution, prevents the lawmakers from abolishing any common law rights, and that since the charter exemption clause deprives those injured, through the negligent failure of cities to maintain their streets, of their common law right of action against the cities, the clause is invalid. Plaintiff seems to believe that that point of view escaped attention in the consideration of our previous cases. * * * [It has been] said that it was unnecessary to 'elaborate the rule that the Constitution

---

[9] *Compare, e.g., Mattson v. Astoria,* 39 Or 577, 65 P 1066 (1901) (charter provision invalid where it immunized both the city and its officers, thereby denying plaintiff any remedy), *with Noonan v. City of Portland, supra,* 161 Or at 248 (charter provision satisfied Article 1, section 10, where it did not purport to immunize the city's officers from liability).

does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object.' [Citation omitted.] We held to similar effect in sustaining the validity of a statute which was attacked under Art. I, § 10, Oregon Constitution: *Perozzi v. Ganiere,* 149 Or 330, 40 P2d 1009 [(1935)]. Article I, § 10, Oregon Constitution, was not intended to give anyone a vested right in the law either statutory or common; nor was it intended to render the law static. Notwithstanding similar constitutional provisions in other states, the courts have sustained statutes which eliminated the husband's common law liability for the torts of his wife and which placed the wife upon an economic level with her husband. They have likewise sustained statutes which have abolished actions for alienation of affections, actions for breach of promise, etc. The legislature cannot, however, abolish a remedy and at the same time recognize the existence of a right: *Stewart v. Houk,* 127 Or 589, 271 P 998, 272 P 893, 61 ALR 1236 [(1928)]. We, therefore, conclude that this contention reveals no infirmity in the charter exemption clause."

*Id.* at 244, 248-250.

Although it was not even mentioned by the court in *Noonan,* the court, when it said,

"Article I, § 10, Oregon Constitution, was not intended to give anyone a vested right in this law * * * nor was it intended to render the law static[;] * * * [the only limitation on the] legislature [is that it] cannot * * * abolish a remedy and at the same time recognize the existence of a right,"

*id.* at 249, could have cited *Evanhoff v. State Industrial Acc. Com.,* 78 Or 503, 154 P 106 (1915), as illustrative of its point. *Evanhoff* brought to this court the issue of the constitutionality, under Article I, section 10, of Oregon's then two-year-old workers' compensation scheme. By that scheme, the Oregon legislature had eliminated the haphazard system of liability of employers to some employees for some injuries occurring under a limited number of circumstances, and replaced it with a system that made employers liable for the medical expenses of their injured workers without regard to fault. The scheme penalized some members of both camps — those plaintiffs who could prove actionable negligence of their employers, and so obtain damages beyond their medical expenses, and those employers who could defeat liability either because they had not been negligent or because they

could show the worker was guilty of contributory negligence or assumption of the risk. A recent law review article describes the outcome of *Evanhoff:*

> "[T]he court for the first time had to deal with a law that denied a well-established cause of action — a tort action for personal injury based on negligence — uncomplicated by a traditional common-law immunity. The court side-stepped the issue by noting that the compensation law allowed both the worker and the employer to elect not to be covered. Therefore, it was the parties themselves, not the law, that took away the remedy as in a mutual waiver. [*Id.* at 518.] Again, the analytical rationale was bolstered by, if not a mere pretext for, public policy balancing. In an uncharacteristic burst of enthusiasm, the court noted:
>
>> " 'Upon the whole case we are of the opinion that the act violates no prescription of the Constitution of this state or of the United States, and that it was properly passed and is in every respect a valid law. * * * Before its enactment one workman out of three received a large compensation for his injuries by an action at law, while the remaining two were defeated and got nothing. Now every workman accepting its provisions receives some compensation if injured; and, taken as a whole, it will be found that more money in the way of compensation is received by the whole body of injured workmen than by the inadequate remedies afforded in the courts. It has been a boon to the employers, the employed, and the community, which latter [*sic*] could formerly only offer to the injured laborer the charity of the almshouse instead of that just compensation which he may now receive without the humiliation of pauperism or the loss of self-respect.'
>
> "[*Id.* at 523-24.] Surprisingly, the issue never resurfaced in Oregon courts, although some other states have had to amend their constitutions to accommodate compensation schemes. [Footnote omitted.]
>
> "The courts have, however, confronted other legislatively created schemes that substitute non-judicial remedies for traditionally judicial ones. The same rationale prevailed. * * * [*See, e.g.,*] *Rueda v. Union Pacific Railroad Co.,* [180 Or 133, 175 P2d 778 (1946) (Article I, section 10, notwithstanding, parties are free to negotiate agreements that have the effect of conferring immunity on one of them from action by the other — to hold otherwise would invalidate many arbitration agreements)]."

Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution,* 65 Or L Rev 35, 51-52 (1986).

*Noonan* and *Evanhoff* held only that Article I, section 10, is not violated when the legislature alters (or even abolishes) a cause of action, so long as the party injured is not left entirely without a remedy. Under those cases, the remedy need not be precisely of the same type or extent; it is enough that the remedy is a substantial one. *See, e.g., Noonan v. City of Portland, supra* (torts of cities); *Evanhoff v. State Industrial Acc. Com., supra* (workers' compensation); *Perozzi v. Ganiere, supra* (guest passenger); *Davidson v. Rogers,* 281 Or 219, 574 P2d 624 (1978) (defamation); *see also* Schuman, *supra.*

It is clear from the language of ORS 30.265(1) itself that the legislature intended to meet fully the requirements of Article I, section 10, when it enacted the statute. The statute specifically identifies the new balance it strikes between municipal corporations and those to whom certain of those corporations could, under limited circumstances, formerly have been liable:

> "Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to action or suit for its torts and those of its officers, employees and agents acting within the scope of their employment or duties, *whether arising out of a governmental or proprietary function* * * *."(Emphasis added.)

The class of plaintiffs has been widened by the legislature by removing the requirement that an injured party show that the municipal corporation's activity that led to the injury was a proprietary one. At the same time, however, a limit has been placed on the size of the award that may be recovered. A benefit has been conferred, but a counterbalancing burden has been imposed. This may work to the disadvantage of some, while it will work to the advantage of others. But all who had a remedy continue to have one. This may not be what plaintiff wants. It may not even be what this court, if it were in the business of making substantive law on this subject, would choose to enact. But it is within the legislature's authority to enact in spite of the limitations of Oregon Constitution, Article I, section 10. *See, e.g., Noonan v. City of Portland, supra.*

We hold that the limitations of ORS 30.270(1)(b) do

not deny plaintiff any right of action against the City guaranteed by Oregon Constitution, Article I, section 10. *See Davidson v. Rogers, supra,* 281 Or at 222. We turn next to plaintiff's arguments under Oregon Constitution, Article I, section 20.

## III.   ARTICLE I, SECTION 20

■　　Article I, section 20, of the Oregon Constitution, prohibits the granting of privileges to any class of citizens which are not available on the same terms equally to all citizens.[10] This provision prohibits grants of two distinct types: "privileges" and "immunities." However, in spite of the fact that the specific issue in this case is the permissible extent of governmental immunity, the prohibition in Article I, section 20, against the grant of "immunities" does not play a role in this case because cities and instrumentalities of the state are not "citizens" for the purposes of Oregon Constitution, Article I, section 20. *See Eckles v. State of Oregon,* 306 Or 380, 387, 760 P2d 846 (1988).

■　　On the other hand, the ability to recover in court against the government for tort damages is a "privilege" of the type contemplated by Article I, section 20. This brings us to the question whether the law allows other citizens or classes of citizens a "privilege" that it denies to the plaintiff. The law does not do that. Plaintiff claims to be a member of two "classes": (1) victims of governmentally inflicted torts; and (2) tort victims suffering damages in excess of $100,000. Plaintiff contends that the different treatment of such persons' claims lacks a rational basis in light of the purpose for drawing the distinction. This is a test drawn from federal equal protection doctrine (and akin to "balancing") that for purposes of Article I, section 20, has been superseded by our more recent decisions. Neither of these classes is cognizable under Article I, section 20.

The original target of this constitutional prohibition was the abuse of governmental authority to provide special

---

[10] Article I, section 20, of the Oregon Constitution provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

Plaintiff does not contend that the OTCA's damage limitations were directed against him individually. He also does not argue that any citizen or class of citizens was granted an immunity which was not made equally available to all citizens.

privileges or immunities *for* favored individuals or classes, not discrimination *against* disfavored ones. *See State v. Savage,* 96 Or 53, 59, 184 P 567 (1920) (Article I, section 20, is "antithesis" of Fourteenth Amendment's equal protection clause). This perspective bears on the section's interpretation of what is a favored "class" under the section. A person who is denied what a favored class receives has standing to demand equal treatment, though this leaves an issue whether to strike down the special privilege or to extend it beyond the favored class. *See Hewitt v. SAIF,* 294 Or 33, 653 P2d 970 (1982).

Those members of the total population who happen to be injured as a result of negligently created dangerous conditions on a road or other kinds of negligence for which they can hold someone fully liable are not an identifiable "class" who under Article I, section 20, are given special privileges by virtue of antecedent personal or social characteristics or societal status, *i.e.,* they could not already be singled out from the general population before their various accidents. As we wrote in another case involving different rights of children who lose a parent by death or by total disablement:

> "As between two children, either may lose a parent to disablement or to death, or first to one followed by the other, as indeed children lose parents who leave the family for other reasons. When the legislature provided for damages for the child's loss in a wrongful death action, it did not distinguish between children *ad hominem,* by personal or social characteristics, as illustrated by laws discriminating against children born out of wedlock that have been found to deny them equal protection. The distinction is not among kinds of children but between the scope of defendants' liability for causing fatal as distinct from nonfatal injuries to the immediate victims of their negligence."

*Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or 543, 567-68, 652 P2d 318 (1982) (footnote omitted).

The class of "victims of governmental torts" exists as a separate class from that of victims of private torts only because such a classification is inherent in a system which, like the OTCA, continues partial sovereign immunity. The classification is not based on personal or social characteristics of the asserted "class." There is no violation of Article I, section 20, on this theory.

■ Neither are "victims whose damages exceed $100,000" a true class for the purposes of scrutiny under Article I, section 20. Those who suffer damages as a result of tortious conduct are not a social "class," whatever the specific amount that would repay them for the damages. *See Norwest v. Presbyterian Intercommunity Hosp., supra.* The distinction made by the OTCA is not between victims with lesser or greater damages; it is between those who are the victims of governmental torts, as opposed to those who are the victims of private tortious conduct. This separation occurs not because of any discrimination between various members of the larger group of victims of tort, but because of the classification inherent in the scheme of partial governmental immunity. The damage limitations of ORS 30.270(1)(b) are therefore permissible under Article I, section 20.

## IV. DUE PROCESS AND EQUAL PROTECTION

■ Plaintiff challenges the OTCA under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.[11] In *Duke Power Co. v. Carolina Env. Study Gp.,* 438 US 59, 98 S Ct 2620, 57 L Ed 2d 595 (1978), however, the United States Supreme Court rejected a due process and equal protection challenge to a federal statute imposing damage limitations on nuclear power accidents. The Court found that "limiting liability is an acceptable method for Congress to utilize in encouraging the private development of electric energy by atomic power." 438 US at 86. Similarly, limiting the tort liability of governmental entities is an acceptable way to protect the state and its municipalities. The legislature could reasonably have concluded that it is necessary to protect local governmental entities from unlimited liability in order to keep taxes down, ensure the continuation of vital public services, and keep insurance costs under control. The damage limitations of ORS 30.270(1)(b) do not violate the United States Constitution. *Duke Power Co. v. Carolina Env. Study Gp., supra.*

From the foregoing, we conclude that none of plaintiff's challenges to the damage limitations of ORS 30.265(1)(b) are well taken. The statute is constitutional.

---

[11] Plaintiff's due process claim is not separately argued in the petition for review. For this reason, we will not separately discuss it.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**LINDE, J.,** concurring.

It is not surprising that Article I, section 10, of the Oregon Constitution has perplexed this court more than any other guarantee in Oregon's Bill of Rights. Most constitutional guarantees are stated as negatives, telling officials what laws they may not enact and what procedures they may not omit, but otherwise leaving decisions to retain or alter the substance of the laws to lawmakers. Article I, section 10, on the other hand, combines affirmative with negative guarantees. In a legal system that, like ours, treats its constitution as law, affirmative assurances of government action create a puzzle what affirmative laws the constitution requires.

Article I, section 10, provides:

> "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

When a statute, contrary to the opening clause, declares that some court procedures may be conducted in secret, the court need only hold that the statute is invalid and cannot be followed. *Oregonian Publishing Co. v. O'Leary,* 303 Or 297, 736 P2d 173 (1987). The second clause can be administered by the courts themselves, disregarding, if necessary, any statutes or actions by other officials that would impose a "purchase" of justice or an improper "delay." *See Haynes v. Burks,* 290 Or 75, 87 n 12, 619 P2d 632 (1980). But the assurance of a "remedy" for "injury" to specified interests appears to promise more than protection against delay and other procedural obstructions.

Yet this court's decisions long have held that the "remedy" clause could not reasonably have been meant to lock into the constitution the common law, equitable, and statutory remedies that existed in 1859, although Judge Matthew Deady, who had been a leader of the constitutional convention, had maintained something close to that position. *Compare Templeton v. Linn Co.,* 22 Or 313, 29 P 795 (1892), with *Eastman v. County of Clackamas,* 32 F 24 (D Or 1887); *see* Schuman, *Oregon's Remedy Guarantee,* 65 Or L Rev 35, 43-46

(1986). The more permissive view of change led to the 50-year-old passage quoted by the majority from *Noonan v. City of Portland,* 161 Or 213, 249-50, 88 P2d 808 (1939):

> "Article I, § 10, Oregon Constitution, was not intended to give anyone a vested right in the law either statutory or common; nor was it intended to render the law static. Notwithstanding similar constitutional provisions in other states, the courts have sustained statutes which eliminated the husband's common law liability for the torts of his wife and which placed the wife upon an economic level with her husband. They have likewise sustained statutes which have abolished actions for alienation of affections, actions for breach of promise, etc. The legislature cannot, however, abolish a remedy and at the same time recognize the existence of a right: *Stewart v. Houk,* 127 Or 589, 271 P 998, 272 P 893, 61 ALR 1236. We, therefore, conclude that this contention reveals no infirmity in the charter exemption clause."

The passage is no more authoritative than others that can be quoted on the opposite side of the issue; in fact, it pretends to no renewed analysis. There is nothing intrinsically absurd in the idea that although statutory and common law remedies may be changed, they must maintain some comparable degree of protection for those interests to which Article I, section 10, refers. In *Noonan,* the passage is preceded by a quotation from *Silver v. Silver,* 280 US 117, 50 S Ct 57, 74 L Ed 221 (1929), to the effect that "the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object," 161 Or at 249. The quotation suggests that the *Noonan* court confused Article I, section 10, with the federal Constitution, which contains no "remedy" clause.

*Stewart v. Houk,* cited in the passage from *Noonan,* in fact helps the present plaintiff, because *Stewart* followed the reasoning of *Eastman* to invalidate a statute denying any recovery on behalf of a guest passenger against the owner or driver of the host vehicle. Thereafter the legislature adopted a new statute requiring such a guest passenger to prove that the guest's injuries were caused by the owner's or operator's intentional, reckless, or grossly negligent conduct or intoxication.

That statute was sustained in *Perozzi v. Ganiere,* 149 Or 330, 40 P2d 1009 (1935), which also was cited in *Noonan.*[1]

*Noonan* illustrates a point noted in Professor Schuman's review of Oregon decisions under Article I, section 10. This court has written many individually tenable but inconsistent opinions about the remedy clause; but with one or two exceptions, the court's broad propositions about changes in existing remedies have given little attention to the clause itself.[2] The text offers three verbal handholds: What harm to one of the protected interests is an "injury," what qualifies as a "remedy," and is this remedy available "in due course of law"?[3] Thus, a statute making general damages for defamation by a media defendant contingent on the defendant's refusal to publish a retraction might be sustained on a theory that the optional retraction would provide an alternate "remedy," or a theory that by virtue of the retraction the plaintiff, though harmed, suffered no legal injury. The court chose the first theory in *Holden v. Pioneer Broadcasting Co.,* 228 Or 405, 365 P2d 845 (1961), and *Davidson v. Rogers,* 291 Or 219, 574 P2d 624 (1978).

In the present case, defendants do not argue, and it is difficult to maintain, that the harm plaintiff has suffered is not a legal "injury." A statute might distinguish and deal differently with economic loss from "general damages" for psychic or other noneconomic harm, like the retraction statute in *Holden,* but the legislature has not done that. The Oregon Tort Claims Act does not deny that all the harm

---

[1] The *Perozzi* court swept by the difficulty (among others) posed by *Batdorff v. Oregon City,* 53 Or 402, 100 P 937 (1909), which invalidated a city charter limiting liability to gross or wilful misconduct or neglect of duty, by declaring that Article I, section 10, "is a 'due process of law' clause" which left it "clearly within the police of power of the state for the legislature to attempt to correct what it considered a growing evil." 149 Or at 342-43, 350.

[2] Professor Schuman observed that the initial approach in *Smith v. Smith,* 205 Or 286, 287 P2d 572 (1955), in which a wife invoked the remedy clause against interspousal immunity, was "analytical" but thereafter stated the court's conclusion in terms of "public policy." Schuman, *Oregon's Remedy Guarantee,* 65 Or L Rev 35, 50 (1986). He concluded that the Oregon cases "indicate a judicial inability to formulate a consistent rule for applying the constitutional mandate," as have those in other states. *Id.* at 56, citing sources.

[3] Not every harm, or even every old common law cause of action, necessarily is an injury to a "person," or to "property," or to "reputation"; a simple, perhaps debatable, example is an ordinary breach of contract.

suffered by plaintiff is of a kind that qualifies as a legal injury. This plaintiff's financial expenses alone far exceed the statutory limit. Nor does the statute say that harm which is compensable when caused by some persons is not a legal injury when caused by other persons, as for instance in the case of parental liability. *See Winn v. Gilroy,* 296 Or 718, 681 P2d 776 (1984). Rather, it puts a dollar cap on the liability of public bodies for recognized tort injuries. ORS 30.260(8).[4]

This is easier to defend with respect to the Port of Portland than the City of Portland. The court notes that the Port is a state agency and partakes of the state's immunity from unconsented suits, a premise that cannot be avoided without overruling a long line of prior decisions. Therefore, the court can say that the Oregon Tort Claims Act provides a new, though limited, remedy against the Port rather than takes away an old one.

The City is in a different position. Its nonliability for what past cases have termed "governmental" as distinct from "proprietary" functions is not derived from the "sovereign immunity" involved in Article IV, section 24. And the court has allowed legislative immunization of cities from tort liability only on condition that the individuals who are personally responsible for harm qualifying as a legal injury remain liable. *Batdorff v. Oregon City,* 53 Or 402, 100 P 937 (1909); *Mattson v. Astoria,* 39 Or 577, 65 P 1066 (1901). This is analogous to altering or limiting the scope of *respondeat superior* rather than wholly depriving a plaintiff of a remedy in due course of law for harm that no one has declared not to be a legal injury when caused by public rather than private negligence. Because this case presents no claim against individual public "officers or employees, or agents," ORS 30.265, I concur with the court.

---

[4] ORS 30.260(8) provides:

" 'Tort' means the breach of a legal duty that is imposed by law, other than a duty arising from contract or quasi-contract, the breach of which results in injury to a specific person or persons for which the law provides a civil right of action for damages or for a protective remedy."